UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

KENNETH HOPPER,                          )
                                         )
         Plaintiff,                      )
                                         )
         v.                              )          No.  4:16 CV 1309 JMB
                                         )
NANCY A. BERRYHILL,[1]                   )
Acting Commissioner of Social Security,  )
                                         )
         Defendant.                      )

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of

the Commissioner denying the applications of Kenneth Hopper ("Plaintiff") for disability

insurance benefits ("DIB") under Title II of the Social Security Act, see 42 U.S.C. §§ 401 et seq.,

and supplemental security income ("SSI") under Title XVI, see 42 U.S.C. §§ 1381 et seq.  Plaintiff

has filed a brief in support of the Complaint (ECF No. 16).  Defendant Commissioner Nancy A.

Berryhill has filed a brief in support of the Answer (ECF. No. 22)  The parties have consented to

the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. §

636(c).  Substantial evidence supports the Commissioner's decision denying benefits, and therefore

it is affirmed. See 42 U.S.C. § 405(g).

## I.      Procedural History

To say this matter has a long and complicated procedural history would be an

understatement.  Fortunately, the ALJ summarized the history in detail in a thorough, thoughtful,

and organized decision.  (Tr. 411-12)  Accordingly, this Court will only briefly summarize the

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for  Acting Commissioner Carolyn W. Colvin as the defendant in this suit.  No further action needs  be taken to continue this suit by reason of the last sentence of section 205(g) of the Social  Security Act, 42 U.S.C. § 405(g).

history as necessary to understand the issues and decision of the Court. Plaintiff was awarded benefits more than 25 years ago, but those benefits ceased in 2003. In 2004, Plaintiff filed applications for DIB and SSI benefits. The case wound back and forth through the system for many years, including a couple of trips to the District Court and additional applications filed on behalf of Plaintiff. To be clear, some of the convoluted path of Plaintiff's claims was caused by missing evidence in the record. Plaintiff eventually settled on an amended onset date of January 24, 2006. Plaintiff's date of last insured for DIB purposes is March 31, 2009. The case was eventually assigned to a new ALJ to ensure proper development of the record and to give Plaintiff a fresh hearing.

The ALJ held a hearing on July 29, 2013. Plaintiff, Plaintiff's mother, impartial medical expert Kathleen O'Brien, Ph.D., and impartial vocation expert ("VE") Dale Thomas each testified. (Tr. 1321-1385) The ALJ held a supplemental hearing on March 4, 2014. (Tr. 1300-20) The ALJ held the supplemental hearing to ensure the completeness of the record and to give Plaintiff's attorney an opportunity to inquire further of Dr. O'Brien and the VE. (Tr. 1301) During the supplemental hearing, Plaintiff stipulated that the record as presented was complete except as to ongoing treatment he was then receiving. (Tr. 1306) Plaintiff's attorney agreed to submit his questions to Dr. O'Brien in the form of proposed interrogatories, which he sent to the Administration on March 24, 2014. (Tr. 436) The proposed interrogatories consisted of requesting Dr. O'Brien to identify sections of several psychologist ethical codes attached thereto, asking whether she agreed with a quoted section from a book, and asking for a copy of her file. (Tr. 1437) The ALJ declined to send the interrogatories to Dr. O'Brien, as discussed in more detail below.

On September 19, 2014, the ALJ issued a decision denying Plaintiff's claims for benefits. (Tr. 411) Plaintiff then unsuccessfully sought review of the ALJ's decision before the Appeals

Council of the Social Security Administration (Tr. 401), making the decision of the ALJ the final

decision of the Commissioner.  Plaintiff has therefore exhausted his administrative remedies, and

his appeal is properly before this Court.  See 42 U.S.C. § 405(g).

In his brief to this Court, Plaintiff raises sixteen (16) points of alleged error denominated as

argument.  (ECF No. 16 at 11-23)  Plaintiff, however, does not present any argument or

meaningful analysis.  Rather, Plaintiff cites purportedly applicable law, typically with a block

quote of a regulatory listing followed by a broad, often one-sentence conclusion.  For example,

Plaintiff alleges that the ALJ erred in concluding that he did not meet or equal the requirements of

Listing 12.04C, but does not actually mention those requirements, and consequently, has not

applied any facts in the record to those requirements.[2]   In her response, the Commissioner has

attempted unpack and address Plaintiff's points of error.

Several of Plaintiff's points of error fall into the same overall categories, which the

undersigned summarizes as allegations that the ALJ erred in:  (1) failing to find that Plaintiff's

conditions meet the criteria of Listing 12.04C; (2) failing to accord adequate weight to the opinion

of a treating physician, S.A. Raza, M.D., and failing to re-contact Dr. Raza and instead according

---

[2] Plaintiff's brief was filed more than one-month after the original deadline and he was
permitted to file a brief in excess of the page limitations.  As noted, Plaintiff's brief included some
sixteen discrete, single-spaced points of error, but no meaningful argument to assist this Court in
assessing the merits of his claims.  To the extent Plaintiff wishes to raise as many issues as possible
to see "what might stick," such a tactic is ill–suited for a Social Security appeal where, by law, the
agency decision is entitled to great deference.  See Tarkington v. Berryhill, 2017 WL 976938, *5
n.7 (E.D. Mo. Mar. 13, 2017) (citing Financial Holding Corp. v. Garnac Grain Co., Inc., 965 F.2d
591, 596 (8th Cir. 1992) (explaining that, except in the unusual or complicated case, raising
numerous issues can leave "the impression that no single issue is important") (citations and
quotations omitted)).   Even in an unusual or complicated case, a failure to properly present an
issue can result in abandonment of that issue on review.  See Vandenboom v. Barnhart, 421 F.3d
745, 750 (8th Cir. 2005) (rejecting a conclusory assertion that ALJ failed to consider whether
claimant met Listings because claimant provided no analysis of relevant law or facts regarding
Listings).  Nonetheless, because Plaintiff is alleging disability, and the record clearly indicates that
he has severe mental impairments which are serious matters, the Court will address Plaintiff's
points of error to the extent possible.

more weight to other opinions; (3) not providing Dr. O'Brien with all of the materials she should have had, not allowing Plaintiff's attorney to "fully question" her with regard to her testimony and failing to schedule (another) supplemental hearing for Plaintiff's attorney to cross-examine Dr. O'Brien; (4) failing to order a consultative examination and to fully develop the record as to Plaintiff's mental RFC; (5) failing to consider post-hearing evidence, specifically records of a post-hearing hospitalization; and (6) failing to "comply with the Appeals Council's prior remand order."

## II.    Background

Plaintiff is currently 54 years old.  He was living with his parents for much if not most of the time period at issue in this case.  (Tr. 36-37, 1361)  There is no doubt that Plaintiff suffers from Bipolar Disorder.  Plaintiff graduated from high school, and then attended some college at the University of Missouri—Science and Technology and at a community college.  (Tr. 354-355)  It appears that Plaintiff did not finish his studies due to substance abuse issues. (Tr. 355)

Plaintiff helps his parents with household chores, including laundry, shopping, and mowing the lawn.  (Tr. 180, 1361)  Plaintiff reports no problems with personal care.  (Tr. 180) Plaintiff reported the ability to shop for himself, though infrequently due to a lack of money. (Tr. 182)  Plaintiff can do some basic cooking for himself when necessary—one of his parents stated that he simply does not take the time to do it.  (Tr. 1134, 1363)  During the pertinent period, Plaintiff's parents have left Plaintiff and traveled internationally, and Plaintiff has successfully cared for himself.  (Tr. 817, 1363)

Plaintiff is divorced and has three children.  (Tr. 1368)  During at least one point during the pertinent period, he also had a girlfriend.  (Tr. 845)  Plaintiff has traveled with one son and his parents to Vermont and the same son had spent two summers at the house.  (Tr. 1367-69) Plaintiff was also able to travel with his parents to Florida.  (Tr. 1368-69)  Much of Plaintiff's

time and effort is directed toward computer gaming and the Internet, where he is involved in a "guild" gaming, as well as maintaining two blogs and other websites.  (Tr. 180, 183, 355, 370)

Plaintiff's work history is minimal and poorly documented in that he seems to have had difficulty keeping track of where he worked and for how long.  In addition, the ALJ found that Plaintiff lacks any motivation or desire to work.  For example, in 2010, Plaintiff wrote a letter to the ALJ then presiding over the case, in which he declared "I really am trying to avoid returning to work."  (Tr. 1176)  Plaintiff notes that he "can get the job yes maybe, I can perform the labor ok its true, but my personal history demonstrates my inability to hold a job for any duration." (Id.)

Plaintiff has been hospitalized a number of times since the early 1980s, including for a suicide attempt and hospitalization in 2004, and over numerous hospitalizations before that.  (Tr. 42-43, 307)  At the time of the amended alleged onset date, however, Plaintiff had found a medication regimen (Celexa, Wellbutrin, and Geodon) which managed his symptoms very well—his own characterization was that they were "pretty effective" though he had sleep issues. (Tr. 40, 354)  Plaintiff reported only mild side effects from medications.  (Tr. 41)  Plaintiff testified that he has still had anxiety over working with other people.  (Tr. 40)  Plaintiff also reported that he sometimes does not eat or sleep for 24 hours, resulting in concentration issues. (Tr. 44)  At the time of the 2013 hearing, Plaintiff testified that these wakeful periods occurred up to twice a week, and that when he does sleep, it is generally for 14 hours or longer.  (Tr. 1360-61)

The most significant psychological events during the pertinent time period took place after the 2014 supplemental hearing.  In April 2014, Plaintiff's parents filed to have him involuntarily committed.  Coinciding with a change in his psychiatric medication, Plaintiff's

condition began to deteriorate, culminating in a violent confrontation with his younger brother involving a threat to kill him. (Tr. 956-57) This encounter, witnessed by his parents, also involved Plaintiff pushing his father when he got involved in the argument. (Tr. 957) Plaintiff was committed to St. Joseph's Hospital from April 16 to April 22, 2014. (Tr. 977- 1011) The application and supporting affidavits for the commitment order were submitted to the Administration on April 23, 2014, but the corresponding hospitalization records were not submitted until September 16, 2014, three days before the ALJ's decision was issued. (Tr. 953, 976)

On May 2, 2014, Plaintiff's parents again filed for involuntary commitment, after Plaintiff allegedly broke into his parents' basement to retrieve his computer and left a note for his father demanding his inheritance. (Tr. 964-966) In her affidavit, Plaintiff's mother stated that Plaintiff's mental state had continued to deteriorate, that he had been talking wildly about knowing how to save the world from nuclear Armageddon and asking her to convey a veiled threat to his brother regarding his children. (Tr. 963) No records were produced from this hospitalization.

### III.   **Medical Records**

Plaintiff's psychological treatment records for the pertinent time period are, on the whole, relatively routine and unremarkable. They are summarized in pertinent part here.

For the first part of the period at issue, Plaintiff's psychological care was provided by Dr. Raza, who had treated him since 2002. (Tr. 324) Dr. Raza's treatment records reflect that Plaintiff's moods were generally stable and that he was functional. In January 2006, near the amended alleged onset period, Plaintiff reported that "everything was going 'all right'," that he had spent three days with his children, and that his sleep and appetite were good. (Tr. 360) Dr. Raza characterized him as "alert, oriented, coherent, relevant and non-psychotic." (Id.) Similarly, his

visit of six months later found him "doing well," sleeping well, rational and with a stable mood. (Tr. 358) At various points, Plaintiff reported being anxious or depressed, generally in relation to either chances to see his children or negative developments in his efforts to obtain disability benefits, but with no indication of significant deterioration or relapse. In late 2009, Plaintiff reported anxiety over his disability determination, blacked out while driving and was feeling "manicky." (Tr. 842-43) At his next appointment, Plaintiff reported the blackout had been determined to be a vasovagal issue (as opposed to a seizure), and at his following appointments, Plaintiff reported being happier than usual and back to his normal relevant, coherent, non-psychotic state. (Tr. 845-46) Overall, Dr. Raza's notes record very few signs of significant psychological impairment or recurrence of severe symptoms, and those few that did show up appear to have resolved without significant intervention or disruption.

The only significant deviation from this pattern is found in a February 25, 2009, note. In that note, Dr. Raza records Plaintiff telling of a psychotic episode "in the past," during which he was seeking a wise man to explain the truth of life. (Tr. 816) During this episode, Plaintiff entered a purple house where he believed he might find the man, only to be arrested and held for a day. (Id.) It is unclear when this incident took place.

In December 2011, Plaintiff switched his psychiatric care to David Goldmeier, M.D. Dr. Goldmeier's treatment records are, if anything, even more routine than those of Dr. Raza. During his initial visit, Plaintiff presented as anxious and depressed, though with no psychosis, thought disorders, or delusions. (Tr. 855) Dr. Goldmeier evaluated him as having fair insight and judgment, with logical and goal-directed thoughts. (Id.) Over the subsequent visits, there were minor variations in Plaintiff's mood (from "pretty good" to "a little depressed"), sleep (from "ok" to "up and down" to "excessive") energy and other factors, but no evidence of mania, disordered

thought processes, or other signs of significant disruption. Overall, Dr. Goldmeier's notes suggest that Plaintiff's psychological issues were generally stable and well-controlled, with normal minor variations.

Plaintiff also saw several other physicians during the pertinent time period for a variety of physical problems. Of some interest in this matter are Plaintiff's consultations with Frank Calandrino, M.D., for sleep issues. Dr. Calandrino noted Plaintiff's irregular sleep cycles and hypersomnia and ordered a sleep study, as well directed that Plaintiff reduce his significant caffeine intake (i.e., an entire pot of coffee or 100 ounces of caffeinated soda), as well as using melatonin and light exposure to regulate his sleep cycles. (Tr. 808-11) A September 10, 2007, sleep study revealed severe obstructive sleep apnea, with 53 events of apnea or hypopnea per hour. (Tr. 812, 799)[3] Once a CPAP device was introduced and adjusted, the rate of events dropped to 3.1 per hour. (Tr. 799) Plaintiff's oxygen saturation also rose from 88.7 percent to 94-95 percent. (Id.) Dr. Calandrino prescribed a CPAP for Plaintiff's home use. (Tr. 813) Plaintiff was non-compliant and discontinued CPAP use by January 2008. (Tr. 802) At the hearing, Plaintiff testified that he "couldn't tolerate the discomfort and noise." (Tr. 1358-59)

## IV.    Opinion Evidence

There were numerous medical opinion statements in this case, most of which were consistent.

The earliest opinion of note appears to be that of treating physician Dr. Raza. As the ALJ mentions, parts of this opinion are scattered throughout the record, but all appear to spring from a December 2005 statement issued shortly before Plaintiff's amended onset date. (Tr. 362) Dr. Raza's opinion of Plaintiff's functional capacities are qualified by the statement "when in a state of

---

[3] The three pages of the report are broken up between transcript pages 799 and 812-13, the appropriate reading order being 812, 799 and 813.

relapse" or other similar language. (Id.) Dr. Raza states that Plaintiff was in "a state of remission" at the time of the report. (Tr. 365) When in the "state of relapse," Dr. Raza stated that Plaintiff displays depression, anger, fear, feelings of guilt or worthlessness, hostility and irritability, grossly disorganized behavior, increased appetite, delusions, paranoid ideation, poor memory recall, poor insight and suicidal ideation, that his symptoms would "often" interfere with his attention or concentration, and that he would have a "marked" inability to deal with work stress. (Tr. 362-363) Dr. Raza also stated that, when in relapse, Plaintiff would have poor to no ability to remember work-like procedures, maintain attention for two hour segments, sustain an ordinary routine without special supervision, complete a normal workday and workweek without interruption from his symptoms, get along with co-workers without distracting them or being distracted by them, or deal with normal work stress.[4] (Tr. 364) Dr. Raza also opined that Plaintiff would have a poor ability to understand, remember and carry out detailed instructions, set realistic goals or make independent plans, or deal with the stress of semi-skilled or skilled work. (Id.) Dr. Raza opined that Plaintiff would have an inability to interact appropriately with the general public or maintain socially appropriate behavior, although he rated his ability to use public transportation, travel to unfamiliar places and adhere to basic standards of hygiene as "fair" and stated that Plaintiff was capable of managing any benefits he received. (Tr. 362, 364)

At the time he actually issued the opinion, Dr. Raza described Plaintiff as coherent, relevant, alert, oriented, not depressed, rational and cooperative.[5] (Tr. 365) The ALJ gave limited

---

[4] This list is in the form of a multi-option checklist, with a number of other activities and ratings available from "Unlimited/Very Good" to "Poor or None." Dr. Raza did not rate any activities other than those he rated Poor or None.

[5] There is another report which is unsigned and undated, but which was apparently directed to Plaintiff's primary care physician, Dr. Nighat Qadri, at the same office as Dr. Raza. As an unsigned and undated report, it is of no evidentiary usefulness. (Tr. 1295)

weight to Dr. Raza's opinion, noting that it was from before the amended onset date and was inconsistent with his later treatment notes, which reflected a general state of remission showing few instances of the disturbances noted during a state of relapse. (Tr. 423)

The record also includes an opinion of Dr. David A. Lipsitz, Ph.D., who conducted a consultative examination on January 24, 2006. (Tr. 353) During this examination, Plaintiff reviewed his history and subjective complaints, describing his moods as "pretty even, though he still gets depressed." (Tr. 353-54) Plaintiff stated that his last hospitalization had been in 2004. (Tr. 354) Plaintiff noted that he was not dating at the time, but he liked to talk to friends online and participate as a member of an online gaming group. (Tr. 355) Dr. Lipsitz found no evidence of active psychotic functioning, delusions, hallucinations, paranoid ideation, ideas of reference or feelings of depersonalization. (Id.) Dr. Lipsitz also found Plaintiff to have "average" range of intellectual functioning, with no memory problems, good concentration, good insight, and good judgment, the ability to handle minor mathematical functions. (Id.) Dr. Lipsitz opined that Plaintiff was able to understand and remember instructions and maintain concentration and persistence on task, as well as manage his own financial affairs, though he noted some difficulties in social interaction and adapting to his environment. (Tr. 356)

Dr. Lipsitz conducted a second examination of Plaintiff in January of 2013, at the instigation of Plaintiff's counsel. (Tr. 904) Dr. Lipsitz again found Plaintiff to fall within the "average" range of intellectual function, although he had some variation amongst areas of function. (Tr. 906) Dr. Lipsitz noted that Plaintiff was able to take a "systematic approach to problem solving when he is motivated[,]" is able to adequately assimilate information from his environment, and can handle complex matrix reasoning sequencing tasks. (Id.) However, Dr. Lipsitz noted on this occasion that Plaintiff was having some difficulty concentrating and his

attention span was "somewhat low," and that he had difficulty learning a novel task at adequate pace. (Id.) Again, Dr. Lipsitz reported no evidence of active psychotic functioning, delusions, hallucinations, paranoid ideation, ideas of reference or feelings of depersonalization at the time of the examination. (Tr. 907)

Plaintiff's medical records were examined by medical consultant Robert Cottone, Ph.D., who issued an opinion on March 6, 2006. (Tr. 161) In pertinent part, Dr. Cottone found that Plaintiff was capable of understanding, remembering, carrying out and persisting at simple tasks, could make simple work-related judgments, relate adequately to co-workers and supervisors and adequately adjust to ordinary changes in work routine or setting. (Tr. 163) Dr. Cottone recommended that Plaintiff not be placed in situations involving intense or extensive interpersonal interaction, close proximity to co-workers, or public contact handling complaints. (Id.)

In May of 2009, Dr. David Peaco, Ph.D., evaluated Plaintiff, specifically in relation to his application for disability benefits. (Tr. 368) Dr. Peaco noted that Plaintiff's flow of thoughts was normal (though his speech a bit fast), and that he was cooperative and had a normal affect. (Tr. 369) Plaintiff was oriented, reporting and demonstrating no memory problems. (Id.) He denied being depressed. (Id.) He stated that his most recent manic episode had been five years before, although he claimed frequent hypomanic episodes. (Id.) Plaintiff also reviewed his social interactions (primarily on the computer) including online gaming, as well as maintaining two blogs and other websites. (Tr. 370) In testing, Plaintiff displayed a "high average" intellectual function, treating "these puzzles as a challenge" and putting forth "a tremendous amount of focus and energy." (Id.) Plaintiff showed no memory or intellectual function impairments, although he had lower subscores on perceptual motor speed and rapid visual search showed mildly below-average performance in perceptual motor speed, rapid visual search and lower digit signal coding. (Tr.

371)  Dr. Peaco stated that these areas "should not severely impair his overall functioning."  (Tr. 372)  Plaintiff's mood and personality testing revealed an "overwillingess to endorse items of pathology and problems" but was otherwise a valid test.  (Tr. 371)  The testing showed "a high level of lassitude and malaise, some slight tendency toward authority problems and family discord," but did not show severe psychotic symptomology, severe depression or severe manic episodes at that time.  (Tr. 372)  Dr. Peaco characterized Plaintiff as "fairly stable" in mood and personality, consistent with "his self-report of fairly minimal symptoms and fairly stable functioning."  (Id.)  Overall, Dr. Peaco opined that Plaintiff should be able to understand and remember simple instructions, having adequate persistence but some mild impairment of pace and concentration.  (Id.)  Dr. Peaco characterized Plaintiff as having moderate impairment of social function, though better in an internet setting.  (Id.)  Dr. Peaco also rated Plaintiff as mild to moderately impaired in his ability to cope with the world around him.  (Id.)  In a subsequent check-off form, Dr. Peaco indicated no issues in understanding, remembering or carrying out simple instructions, with mild limitation on his ability to make judgments on simple work-related decisions.  (Tr. 1281)  Dr. Peaco also found that Plaintiff was mildly limited in his ability to carry out and make decisions on complex work-related matters, although he was able to understand and remember them.  (Id.)  Dr. Peaco rated Plaintiff as moderately impaired in his ability to interact appropriately with the public and supervisors, though markedly limited in his ability to interact with the co-workers and to respond appropriately to usual workplace situations or changes in routine.  (Tr. 1282)  The ALJ gave this evaluation and opinion significant weight, finding it consistent with the treatment records as a whole, as well as the findings of several other sources. (Tr. 422)

Finally, there is the opinion of impartial medical examiner Dr. Kathleen O'Brien.  Dr.

O'Brien reviewed the medical records and other opinions, and opined at the administrative hearing that Plaintiff suffered from Bipolar Disorder I and Generalized Anxiety Disorder. (Tr. 1329) Dr. O'Brien asserted that Plaintiff displayed moderate limitation in social function, and mild impairment of his concentration, persistence and pace, escalating to moderate during times of great stress. (Tr. 1330) Dr. O'Brien indicated that Plaintiff's potential work should be limited to simple tasks in an effort to reduce stress, not interact with the public, and have occasional contact with co-workers and supervisors. (Tr. 1331) In terms of his treatment, Dr. O'Brien noted that Plaintiff had been on a medication regimen for some time with very little change and no noted side effects. (Tr. 1333-34) The ALJ placed significant weight on this opinion, deeming it consistent with the medical treatment records as a whole and most of the other opinions offered by medical sources.

The record also includes, from time to time, so called Global Assessment of Functioning or GAF[6] scores for Plaintiff. The ALJ noted such GAF scores, but properly discounted those scores for the reasons stated in the written decision. See Wright v. Colvin, 789 F.3d 847, 855 (8th Cir. 2015). (finding that "substantial evidence support[ed] the ALJ's decision not to give weight to [claimant's] GAF score because GAF scores have no direct correlation to the severity standard used by the Commissioner").

**V.    Standard of Review and Legal Framework**

To be eligible for SSI and DIB benefits, a claimant must prove that s/he is disabled within the meaning of the Act. See Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Act, a disability

_____

[6] The Global Assessment of Functioning Scale ("GAF") is a psychological assessment tool wherein an examiner considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM–IV"), 32 (4th ed.1994). As the ALJ noted, the DSM-V does not include GAF scores.

is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if [her] physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

Per regulations promulgated by the Commissioner, the ALJ follows a five-step process in determining whether a claimant is disabled. "During this process the ALJ must determine: '1) whether the claimant is currently employed; 2) whether the claimant is severely impaired; 3) whether the impairment is, or is comparable to, a listed impairment; 4) whether the claimant can perform past relevant work; and if not 5) whether the claimant can perform any other kind of work.'" Andrews v. Colvin, 791 F.3d 923, 928 (8th Cir. 2015) (quoting Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006)). "If, at any point in the five-step process the claimant fails to meet the criteria, the claimant is determined not to be disabled and the process ends." Id. (citing Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005)). See also Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011).

The Eighth Circuit has emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). The ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record as a whole. See

Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008).  Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same).

Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The district court must "also take into account whatever in the record fairly detracts from that decision."  Id.  Specifically, in reviewing the Commissioner's decision, a district court is required to examine the entire administrative record and consider:

1. The credibility findings made by the ALJ.
2. The claimant's vocational factors.
3. The medical evidence from treating and consulting physicians.
4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.
5. Any corroboration by third parties of the claimant's impairments.
6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (citation omitted).

A reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011).  A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance.  Id.; see also Chaney v. Colvin, 812 F.3d 672, 676 (8th Cir. 2016).  Similarly, if the record supports inconsistent conclusions, and the ALJ's decision reflects one of those conclusions, then a reviewing court must affirm the decision.  See McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010).

## VI.     The ALJ's Decision

The ALJ's decision conforms to the five-step process outlined above.  The ALJ found that Plaintiff met the insured status requirements through March 31, 2009, and that he had not engaged in substantial gainful activity since the alleged onset date of January 24, 2006.  (Tr. 414)  The ALJ further found that Plaintiff had severe impairments of bipolar disorder and generalized anxiety disorder.  (Id.)  The ALJ found that he also had non-severe impairments of obstructive sleep apnea (which was treatable via CPAP but which Plaintiff refused to use) and hypersomnia.  (Tr. 414-15)

The ALJ found that none of Plaintiff's impairments or combination of impairments met the criteria for the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 or was medically equivalent thereto.  (Tr. 415)  Specifically, the ALJ analyzed Plaintiff's eligibility under Listings12.04 and 12.06 and analyzed Plaintiff for the "paragraph B" and "paragraph C" criteria. (Tr. 415-16)

The ALJ found that Plaintiff displayed only mild restriction on activities of daily living, as he was able to take care of his personal needs and perform household cleaning activities and yard work.  (Tr. 415)  The ALJ also noted Plaintiff's ability to function independently during extended periods while his parents travel internationally.  (Id.)  Plaintiff was determined to have moderate limitations in social functioning, with limited in-person socialization.  (Tr. 416)  However, he maintains social relationships online, has previously been married, reported having a girlfriend during the period at issue in this matter, and he sees his children.  (Id.) The ALJ also found that Plaintiff had moderate difficulties in maintaining concentration, pace or persistence.  (Id.)  Further, she considered whether Plaintiff met the criteria for paragraph C of or 12.06, and found they were not satisfied as discussed below. The ALJ found that he did not qualify for a listing for his psychological or mental impairments.  (Tr. 416)

The ALJ determined that Plaintiff had a physical residual functional capacity ("RFC") to perform work at all exertional levels. (Id.) The ALJ found that Plaintiff's mental impairments resulted in the following non-exertional limitations: Plaintiff is able to perform simple repetitive tasks; he should not perform work that involves direct interaction with the public; but he can have occasional interaction with co-workers and supervisors. (Id.) In making this RFC determination, the ALJ summarized the relevant medical records discussed above, as well as Plaintiff's own statements regarding his abilities, conditions, and activities of daily living. The ALJ specifically detailed the pattern in his treating physicians' notes of "reporting only intermittent and brief mood or anxiety problems," as well as his ability to travel, visit with his children, and perform activities of daily living. (Tr. 419) The ALJ also discussed Plaintiff's ability to function independently when his parents have gone on extended international trips, which she found supported a conclusion that "when *required* to do so, the claimant is more than capable of caring for himself on an ongoing basis." (Tr. 425; emphasis in original)

While the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, she also determined that his statements regarding their intensity, persistence and limiting effect were not entirely supported by the record as a whole. (Tr. 425)

The ALJ found that Plaintiff's "biggest barrier to working is not his mental health problems, but rather his overall motivation to work." (Id.) The ALJ noted Plaintiff's overall poor work record, as well as his statement in the 2010 letter to a previous ALJ that "I really am trying to avoid returning to work." (Tr. 425, 1175)

The ALJ concluded that Plaintiff had no past relevant work history, but that he had completed high school (and some college) and is able to communicate in English. (Tr. 425-26)

Based on hypothetical questions posed to the VE, the ALJ found that Plaintiff was not under a disability within the meaning of the Social Security Act because someone with his age, education and functional limitations could perform other work that existed in substantial numbers in the national economy, including as a bench assembler, DOT 706.684-042 (with approximately 114,000 jobs nationwide) or a laundry worker (with approximately 298,000 jobs nationally).  (Tr. 426)  As such, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security statute and regulations.  (Id.)

## VII.    Analysis of Issues Presented

Plaintiff has not directly challenged the ALJ's adverse credibility finding.  This adverse finding, however, certainly played a part in other aspects of the ALJ's decision, including aspects challenged by Plaintiff.  The undersigned finds the ALJ complied with the process generally provided in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), and there is substantial evidence in the record to support the ALJ's conclusion regarding Plaintiff's credibility.  A review of the ALJ's decision shows she discredited Plaintiff's subjective complaints for numerous good reasons and thoroughly discussed those reasons.  See Julin v. Colvin, 826 F.3d 1082, 1086 (8th Cir. 2016) (explaining that "[c]redibility determinations are the province of the ALJ" and the deference owed to such determinations); Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003) (holding that "[i]f an ALJ explicitly discredits the [plaintiff's] testimony and gives good reasons for doing so, [the reviewing court] will normally defer to the ALJ's credibility determination").

### A.    Listing 12.04C (Plaintiff's Bipolar Disorder)

Given Plaintiff's impairments of bipolar and anxiety disorders, the ALJ properly considered Listings 12.04 and 12.06.  Listing 12.04 focuses on depression, bipolar, and related disorders, and Listing 12.06 focuses on anxiety-related disorders.  See 20 C.F.R. P. 404 Subpt. P.; 20 C.F.R. Pt.

416 Subpt. P.  The ALJ found that Plaintiff did not meet or equal either Listing.

Plaintiff's argues that the ALJ erred because he qualifies as disabled under Listing 12.04, utilizing the Part C criteria.  The entirety of Plaintiff's argument is that "[t]he multiple hospitalizations and reports by his treating psychiatrist establish disability."  (ECF No. 16 at 12) Plaintiff does not refer to any timeframe or any specific psychiatrist, let alone any specific report.

"[T]he listings were designed to operate as a presumption of disability that makes further inquiry unnecessary….  That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and he is awarded benefits without a determination whether he actually can perform his own prior work or other work." Lott v. Colvin, 772 F.3d 546, 549 (8th Cir. 2014) (quoting Sullivan v. Zebley, 493 U.S. 521, 532 (1990)).

In order to qualify under Listing 12.04C, as in effect at the time of the decision, Plaintiff must have a "chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support" and one of three criteria:

> (1)     Repeated episodes of decompensation, each of extended duration; or
>
> (2)     A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> (3)     Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04C

"Repeated episodes of decompensation, each of extended duration" is defined as three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. Id.

at 12.00C(4). The record does not show such episodes within the period at issue. The only instances of significant deterioration of his symptoms during the period between the amended onset date and the decision were the April/May 2014 domestic incidents. Either they did not last long enough individually to satisfy the duration criteria, or (if counted as a continuous episode) they are not repeated. While Plaintiff had been hospitalized a significant number of times prior to the period at issue, these hospitalizations are not adequate to satisfy the criterion.

As to paragraphs 2 and 3, the record reflects that Plaintiff is capable of coping with a wide variety of circumstances without apparent worsening of his symptoms, suggesting that he is more than marginally adjusted. In addition to the wide variety of ADLs Plaintiff performs, he was able to adequately cope with his parents (his primary support system) leaving on extended trips, as well as extended visits by his children and his own travel. The only instances of significant deterioration of his symptoms during the period between the amended onset date and the decision were the incident at the purple house and the April/May 2014 domestic incidents. Neither one appears to have been linked to changes in demands upon Plaintiff or changes in his support structure or routine. No indication of cause is given for the former, and the 2014 incidents appear to have been directly linked to the change in his medication regimen and not the increased demands or other changes.

As such, the record contains sufficient evidence to support the ALJ's finding that Plaintiff did not meet the requirements of Listing 12.04C.

**B.      Discounting Dr. Raza's Opinion**

Plaintiff also alleges that the ALJ erred in failing to accord adequate weight to the opinion of Dr. Raza as his treating physician, failing to re-contact Dr. Raza and, instead, according more weight to other medical opinions.

There is no dispute that Dr. Raza was Plaintiff's treating physician during a significant portion of the relevant time period. "A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Reece v. Colvin, 834 F.3d 904, 908-09 (8th Cir. 2016) (internal quotations omitted). "Although a treating physician's opinion is usually entitled to great weight, it 'do[es] not automatically control, since the record must be evaluated as a whole.'" Id. (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)). "A treating physician's own inconsistency may undermine his opinion and diminish or eliminate the weight given his opinions." Milam v. Colvin, 794 F.3d 978, 983 (8th Cir. 2015) (internal quotations omitted).

Here, the ALJ found that Dr. Raza's opinion statement (asserted at various points in the record) was not consistent with his own treatment notes, undermining its controlling weight. There is sufficient support in the record for this determination. Dr. Raza's medical statement asserts that Plaintiff is severely limited in almost all areas of mental function. Significantly, however, Dr. Raza's opinions are qualified with an extremely important caveat in that he discusses Plaintiff's abilities as severely limited "when in a state of relapse." (Tr. 362, 364-65) The statement itself notes that Plaintiff was in a "state of remission" at that time. (Tr. 365) Plaintiff largely remained in that state of remission during the time Dr. Raza treated him, with relatively minor dips and upswings in mood, energy and sleep. Overall, Dr. Raza's treatment notes paint a picture of a patient with a serious but relatively well-controlled mental illness, seldom adjusting his (relatively basic) medication regimen and seeing him for follow-up appointments roughly every three months. Such conservative, routine treatment is not consistent with the level of dysfunction Dr. Raza asserted in his opinion statement. See Robinson v. Sullivan, 956 F.2d 936, 840 (8th Cir. 1992)

(course of conservative treatment contradicted claims of disabling pain).

As for Plaintiff's allegation of error in regard to failing to re-contact Dr. Raza, there is nothing in the regulations requiring an ALJ to re-contact a treating physician whose opinion was unreliable.  Hacker v. Barnhart, 459 F.3d 934, 938 (8th Cir. 2006).[7]  Having determined that Dr. Raza's opinion was due limited weight, it was within the ALJ's discretion to give the opinions of the consultative examiners and other acceptable medical sources weight over that of a treating physician, where these consultative physicians' assessments were consistent with the evidence of record.  See Toland v. Colvin, 761 F.3d 931, 937 (8th Cir. 2014).

### C.     Dr. O'Brien

Plaintiff argues that it was error for the ALJ to give significant weight to Dr. O'Brien's testimony, because she admitted she did not review the entire record, was not asked to evaluate new evidence added to the record since she completed her initial review, was not provided with a transcript or summary of any medical testimony provided in a prior hearing on the same case, and did not allow Plaintiff's attorney to fully question Dr. O'Brien regarding her testimony.

As to Plaintiff's assertion that placing significant weight on Dr. O'Brien's opinion was error because she had not reviewed the entire record, this is not quite an accurate statement of the regulatory standard.  As noted in the CFR sections cited by Plaintiff, "the extent to which a medical source is familiar with the other information in your case record" is one factor that an ALJ considers in deciding how much weight to accord an opinion.  20 C.F.R. §§ 404.1527(c)(6); 416.927(c)(6).  However, there is no requirement that a medical source must have access to and review the entirety of the record or else have their opinion disregarded.  As noted by the ALJ, Dr.

_____

[7] As Defendant notes, in a letter to one of the previous ALJs, Plaintiff criticized Dr. Raza and his knowledge of Plaintiff's situation.  Plaintiff noted the short amount of time spent at each appointment and felt that Dr. Raza had not paid enough attention "to have a good opinion."  (Tr. 1175)

O'Brien's opinion was essentially consistent with the medical evidence in the record as a whole, as well as the opinions of Drs. Peaco, Lipsitz and Cottone. As such, according Dr. O'Brien's opinion significant weight was within the ALJ's discretion. See Casey v. Astrue, 503 F.3d 687, 694 (8th Cir. 2007) (affirming ALJ's decision to grant more weight to nonexamining reviewer's opinion because the opinion was consistent with record as a whole).

Plaintiff does not specify in his brief what portion of the record Dr. O'Brien did not review, although in his Statement of Facts Plaintiff mentions that Dr. O'Brien was apparently not sent the actual hospitalization records from his April 2014 involuntary commitment. Presumably, these records are the "new evidence" that Plaintiff states the ALJ should have asked Dr. O'Brien to review. (ECF No. 16 at 16) Plaintiff claims that the failure to ask for such review was a violation of the requirements of the Hearings, Appeals and Litigation Law Manual ("HALLEX").[8] HALLEX I- 2-5-38(B) directs an ALJ to ensure that a medical examiner receives "[i]f applicable, a transcript, written summary, or recording of any [medical examiner] testimony provided in a prior hearing for the same claimant."

There is some debate as to whether the instructions in HALLEX have the force of regulation (and are thus binding, with violations requiring remand) or if they are administrative guidelines, the violation of which does not require remand. The Eighth Circuit has not ruled on this issue, and there is a split in those circuits which have ruled. See Lovett v. Astrue, No. 4:11CV1271 RWS TIA, 2012 WL 3064272, at *10 (E.D. Mo. July 6, 2012), *report and recommendation adopted*, No. 4:11 CV 1271 RWS, 2012 WL 3062803 (E.D. Mo. July 27, 2012).[9]

---

[8] Plaintiff cites to HALLEX I-2-5-38(C)(5) as authority for this proposition. As noted by Defendant, the citation appears to be HALLEX I-2-5-38(B).

[9] "The Ninth Circuit found HALLEX to be an internal manual with no legal force ... the Fifth Circuit found that although HALLEX does not carry the authority of the law, 'where the rights of individuals are affected, an agency must follow its own procedures, even where the

The prevailing jurisprudence in this District is that "the Eighth Circuit would hold that HALLEX does not have the force of law." Ellis v. Astrue, 4:07CV1031 AGF, 2008 WL 4449452, at *16 (E.D. Mo. Sept. 25, 2008). See also Lovett, 2012 WL 3064272, at *10; Medvrich v. Colvin, 4:13 CV 1466 DDN, 2015 WL 58925, at *4 (E.D. Mo. Jan. 5, 2015); Lobos v. Colvin, 5:15- CV-5007, 2016 WL 8710077, at *9 (W.D. Ark. Apr. 1, 2016), report and recommendation adopted, 5:15-CV-5007, 2016 WL 3523740 (W.D. Ark. June 22, 2016). In Ellis, a Judge of our Court reasoned that the Eighth Circuit would treat HALLEX like the similar Program Operations Manual System (POMS), also put forth by the Social Security Administration, to aid in the resolution of these claims, and found that while an ALJ should consider them, they did not have the force of law. Ellis, 2008 WL 4449452, at *16. As such, remand is only necessary where an ALJ's error jeopardizes the existence of substantial evidence to support the ALJ's decision, or where the ALJ applies the wrong legal standard. Lovett, 2012 WL 3064272, at *11.

With regard to the transcript that Plaintiff claims that the ALJ failed to provide to Dr. O'Brien, there is no indication as to what transcript might be at issue, other than her own testimony from the July 2013 administrative hearing. The ALJ indicated at the second hearing that she would send Dr. O'Brien an audio recording of the hearing along with additional medical records so that Dr. O'Brien could supplement her original testimony if necessary. (Tr. 1311) Dr. O'Brien received the records. (Tr. 975) There is no indication that the promised audio recording was not sent as well. Even if Dr. O'Brien did not have a copy of her own prior testimony, this appears to be harmless error. Dr. O'Brien's statement in her letter that the new records did not change her opinion no doubt implies that she was familiar enough with her original opinion and testimony to

---

internal procedures are more rigorous than otherwise be required' and should prejudice result from a violation of an agency's internal rules, the result cannot stand. ... [T]he Third Circuit has opined that HALLEX is an internal guidance tool and has no legal force." Lovett, 2012 WL 3064272, at *10 (quoting Newton v. Apfel, 209 F.3d 448, 459 (5th Cir. 2000)).

make that comparison.  Plaintiff has failed to show any harm inasmuch as the record was

sufficiently developed to allow the ALJ to reach her decision, and Plaintiff has not shown the ALJ

would have reached a different decision.  See Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th

Cir. 2003) (harmless error can be applied to an ALJ's decision); Byes v. Astrue, 687 F.3d 913,

917-18 (8th Cir. 2012) (to show that an error was not harmless, a claimant must provide some

indication that the ALJ would have decided the case differently if the error had not occurred).

　　　　As to the involuntary commitment hospitalization records, the issue is discussed in more

detail below.

　　　　Plaintiff also alleges that his attorney was denied the opportunity to interrogate Dr. O'Brien,

through the ALJ's failure to schedule a supplemental hearing after Dr. O'Brien submitted "a post-

hearing report" (presumably her response to the ALJ's interrogatories regarding the additional

records), "not permitting the claimants' representative to fully question the ME regarding her

testimony" and that he was "denied the due process right to cross-examine the testifying medical

expert."  (ECF No. 16 at 17, 19, 20)  As to the former, Plaintiff again turns to HALLEX as

authority, specifically HALLEX I-2-7-1.  In addition to the above-discussed question of

HALLEX's standing, the "post-hearing report" was essentially a nullity; it simply stated that

review of the additional records had not changed Dr. O'Brien's opinion.

　　　　With regard to cross-examining and fully examining Dr. O'Brien, Plaintiff's attorney had

ample chance.  His attorney questioned Dr. O'Brien at length in the initial hearing.  (Tr. 1334-38,

1343-50, 1354-56)  At the second hearing, Plaintiff's attorney stated that he only had a couple of

questions for Dr. O'Brien, which he offered to submit in the form of interrogatories.  (Tr. 1308,

1311)  Those proposed interrogatories consisted of asking Dr. O'Brien to identify copied sections

of the ASPPB Code of Conduct, the American Psychological Association Ethical Principles of

Psychologists and Code of Conduct, the Specialty Guidelines for Forensic Psychology, and then asking whether they applied to her work. (Tr. 436-458) Plaintiff's attorney had previously stipulated that he had no objections to Dr. O'Brien serving as a medical expert. (Tr. 1327) As such, these proposed interrogatories were of no relevance or probative value, and the failure to promulgate them to Dr. O'Brien was harmless error, if error it was. Byes, 687 F.3d at 917-18. Plaintiff's attorney had ample opportunity to question Dr. O'Brien on the bases of her opinion, which he did.

On the whole, Dr. O'Brien was provided with a wealth of information from which to formulate an opinion on Plaintiff's impairments and functional capacity. The opinion Dr. O'Brien formed was one of several put forth by acceptable medical sources, all but one of which (that of Dr. Raza)[10] were generally consistent with the ALJ's formulation of the RFC and subsequent decision. The ALJ's determination would have been sufficiently supported by medical evidence even if she had placed no weight on Dr. O'Brien's testimony. As such, Plaintiff's allegations of error as to Dr. O'Brien are insufficient to undermine the ALJ's decision.

**D.** **Developing the RFC and Ordering a Consultative Examination**

Plaintiff makes two somewhat nebulous but seemingly related arguments. First, the ALJ allegedly erred in "failing to order a consultative examination … instead of obtaining testimony from a non- examining psychologist." Second, the ALJ allegedly "failed to comply with the duty to develop the record as to the [Plaintiff's] mental RFC." (ECF No. 16 at 17, 19)

As to the alleged failure to adequately develop the RFC, this appears to be another variation on saying the ALJ should have requested additional documentation from Dr. Raza. Additional contact is only required when the record is incomplete, and "a lack of medical evidence to support

---

[10] As explained above, the ALJ fully considered and properly discounted Dr. Raza's opinion.

a doctor's opinion does not equate to underdevelopment of the record as to a claimant's disability[.]" Martise, 641 F.3d at 927. The ALJ was not required to re-contact Plaintiff's treating physician, because there was sufficient evidence from other medical sources to offer informed opinions and for the ALJ to make a determination of disability. See 20 C.F.R. §§ 404.1512(e)-(e)(1); Hacker v. Barnhart, 459 F.3d 934, 938 (8th Cir. 2007) ("The regulations provide that the ALJ should re-contact a treating physician when the information the physician provides is inadequate for the ALJ to determine whether the applicant is actually disabled," but '[t]he regulations do not require an ALJ to re-contact a treating physician whose opinion was inherently contradictory or unreliable."); Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005) ("While the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped."). No crucial issue remained undeveloped.

Similarly, another consultative examination was unnecessary because the record was adequately developed. An ALJ must order a consultative examination when there is insufficient evidence on a crucial issue. Meyers v. Colvin, 721 F.3d 521, 527 (8th Cir. 2013). Here, between the treatment records, Dr. Peaco's consultative examination, Dr. Lipsitz's consultative examinations (one at the instigation of Plaintiff's attorney), various medical opinions, the function report and hearing testimony, there was sufficient evidence to make a determination on Plaintiff's impairments and RFC without an additional consultative examination. The vast majority of the records and opinions suggested that Plaintiff may sometimes have concentration or attention problems (possibly related to stress) and social functioning deficits which merit modifications of how often he would interact with others. The RFC explicitly and adequately addresses these issues and is supported by substantial evidence.

Thus, Plaintiff has not established that the ALJ's alleged "failure to fully develop the record resulted in prejudice, and has therefore provided no basis for remanding for additional evidence." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) (citing Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995) (determining that reversal on account of a failure to develop the record is only warranted where such failure is prejudicial)).

### E.    The Post-Hearing Hospitalization Records

Plaintiff argues that the ALJ erred in failing to consider the April 2014 hospitalization records submitted after the second hearing, and that the Appeals Council should have taken them into account and overturned the ALJ's decision. Although this is a close question, the undersigned concludes that any failure to explicitly address the hospitalization records is harmless error, as those records added little of substance to the involuntary commitment petitions which the ALJ and Dr. O'Brien explicitly considered.

In April 2014, after the second hearing and coinciding with a change in Plaintiff's psychiatric medications, Plaintiff's condition deteriorated, culminating in a violent confrontation with his younger brother. (Tr. 956-957) This encounter, witnessed by his parents, also involved Plaintiff pushing his father. (Tr. 957) Plaintiff was ordered involuntarily committed on affidavits from his parents.

The hospitalization records, submitted three days prior to the ALJ's decision, dealt with the commitment. (Tr. 977)[11] The records add little substance over and above the facts as alleged in the affidavits. Upon admission on April 16, 2014, Plaintiff confirmed that his condition deteriorated after adding Zoloft to his medication regimen two weeks earlier, and was possibly exacerbated by a switch to a generic form of another medication. Plaintiff had become

_____
[11] Although there was a subsequent commitment order the following month after Plaintiff was discharged, no medical records were submitted for this second occurrence.

increasingly irritable, threatened to kill his brother, and hit his father in anger. (Tr. 988) Plaintiff displayed no hallucinations, was grossly intact cognitively, was irritable and showed "extremely poor impulse control" and poor insight/judgment. (Tr. 989) The following days showed Plaintiff considering where he would live now that he was unwelcome at his parents' house and chafing at the hospital's rules. (Tr. 990) On the third day, the attending physician noted that Plaintiff did not appear psychotic or thought-disordered. (Tr. 1001) On April 22, 2014, the attending physician noted that Plaintiff displayed no aggression, and Plaintiff was discharged. (Tr. 1005-6)

"Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010) (quoting Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998)).

Generally speaking, hospitalization records provide key insight into a claimant's condition at its worst, especially in situations (such as here) where there is a serious mental health impairment that has been effectively treated and has been in remission. The reasoning of the ALJ's decision is based on the premise that although Plaintiff's condition was disabling in the past, treatment has brought him to a point where he can reasonably be expected to maintain gainful employment. Incidents like Plaintiff's April 2014 situation cast doubt upon that premise.

In this case, however, the key points of the April 2014 incident were contained in the affidavits supporting commitment, with the hospital records essentially restating or confirming the circumstances. Both the ALJ and Dr. O'Brien reviewed those affidavits and determined that the information as to what happened was not sufficient to alter their positions. It is, in some ways, consistent with the overall narrative underlying the ALJ's decision: that Plaintiff's condition was adequately controlled by his medication regimen, and that this incident occurred when that treatment regimen was altered. The hospital records included in the transcript are duplicative in

substance to the commitment affidavits which the ALJ and Dr. O'Brien reviewed and addressed. Therefore, any error in failing to expressly consider those records was harmless in that it did not prejudice Plaintiff and did not deprive the Commissioner's decision of substantial evidentiary support. See Vance v. Berryhill, 860 F.3d 1114, 1118 (8th Cir. 2017) (citations and internal quotations omitted).

Plaintiff also appears to assign error to the Appeals Council's failure to review the ALJ's decision in light of the April 2014 hospitalization records. The Court has no jurisdiction over a decision by the Appeals Council not to review an ALJ's determination (which is a nonfinal administrative determination), only over the decision itself. See Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992) ("[W]e may only review the ALJ's final decision, not the Appeals Council's non-final administrative decision to deny review.").

F.      Failure to Abide by the Appeals Council Order

Plaintiff also asserts that the ALJ failed to abide by the Appeals Council's order on the last remand. Plaintiff does not specify what the ALJ failed to do. Plaintiff offers no argument or citation to the record to specify or support this argument. It is not reviewing court's function to construct an argument for a party. See, e.g., McPherson v. Kelsey, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to … put flesh on its bones.") (citations omitted). Without the requisite specificity and analysis supported by the record, Plaintiff has not met his burden to show prejudicial error. See Shineski v. Sanders, 556 U.S. 396, 409-10 (2009) (party seeking to reverse has the burden to explain harm in alleged error). As such, Plaintiff's contention that the ALJ failed to abide by an unidentified remand order is without merit and deemed

abandoned.  See Rotskoff v. Cooley, 438 F.3d 852, 854-55 (8th Cir. 2006) (observing that an issue is deemed abandoned where it is not developed in brief); accord, Vandenboom, 421 F.3d at 750 (rejecting out of hand a conclusory assertion that ALJ failed to consider whether claimant met Listings because claimant provided no analysis of relevant law or facts regarding Listings).

**VIII.   Conclusion**

For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.  See Finch, 547 F.3d at 935.  Similarly, the Court cannot say that the ALJ's determinations in this regard fall outside the available "zone of choice," defined by the record in this case.  See Buckner, 646 F.3d at 556.  For the reasons set forth above, the Commissioner's decision denying benefits is affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**. A separate Judgment shall accompany this Memorandum and Order.

/s/ John *M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this  25th day of September, 2017.